UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRANDAN[1] WEST,

          Petitioner,

    v.

R. COUENY,

          Respondent.

**DECISION AND ORDER**

1:19-CV-01353 EAW

## I.  INTRODUCTION

*Pro se* petitioner Brandan West ("Petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Dkt. 1).  Petitioner challenges the constitutionality of the judgment entered against him on March 19, 2015, in New York State, Monroe County Court (Argento, J.), following a jury verdict convicting him of two counts of second-degree criminal possession of a weapon (New York Penal Law ("P.L.") § 265.03(3)).  (*Id.* at 1).[2]  For the reasons below, the request for a writ of habeas corpus is denied and the petition is dismissed.

---

[1]    The state court records and transcripts, as well as the website maintained by the New York State Department of Corrections and Community Supervision ("DOCCS"), spell Petitioner's first name as "Brandon."  *See* https://nysdoccslookup.doccs.ny.gov/ (search for DIN 15B1023) (last accessed Mar. 25, 2024).  However, Petitioner spelled his name as "Brandan" when he signed his name in the petition.  (Dkt. 1 at 15).  Therefore, that is the spelling the Court has used herein.

[2]    Page citations to all pleadings are to the pagination automatically generated by the Court's case management and electronic filing system (CM/ECF) and located in the header of each page.

## II.  BACKGROUND

### A.  Indictment

A Monroe County grand jury returned indictment 2013-013980 on December 10, 2013, charging Petitioner; his friend, Andre Michael Cotton ("Cotton"); and their friend, Tashad Prad ("Prad") with two counts each of second-degree criminal possession of a weapon (P.L. § 265.03(3)).  The indictment alleged that on or about November 21, 2013, while acting alone or in concert, Petitioner and his co-defendants knowingly possessed two loaded firearms (a nine millimeter Luger Lorcin L9MM semi-automatic pistol and a .40-caliber Smith &Wesson Firestar semi-automatic pistol); and that such possession did not occur in their homes or places of business.  (SR: 571-72).[3]

### B.  Trial

Petitioner's jury trial commenced on February 9, 2015, in State of New York County Court, Monroe County, before County Court Judge Victoria M. Argento ("trial court").

#### 1.  Prosecution's Case

Mikki Coleman ("Mikki") testified that on November 21, 2013, she and her husband, Julian Coleman ("Julian"), were living at 356 Campbell Street with their two children and their dog.  (Mikki: 212-13).[4]  At around 10:30 p.m. that night, the Colemans'

---

[3]    Citations to "SR:" refer to the Bates-stamped page numbers at the bottom of the state court records, filed by Respondent at Docket 8-3.

[4]    Citations to "[name]: [page number]" refer to pages of a particular witness's trial testimony.  Citations to "T." refer to pages of the trial transcript that do not reflect witness testimony.  All of the transcripts from Petitioner's state court proceeding are filed at Docket 8-4.  Page citations to the transcripts are to the original pagination.

dog had been barking for about two hours.  (T: 213).  Julian went outside, and Mikki heard

him ask someone, "could you please keep it down."  (*Id.*).  Julian walked back into the

house, got a drink of water, retrieved a BB gun from a kitchen cabinet, and left the house

again.  (Mikki: 214-15).  Mikki did not go outside with him but instead went to put their

dog in another room.  (Mikki: 215).

Moments later, Mikki heard four to five gunshots from inside their house and ran to

the front door.  (Mikki: 215-16).  She saw Julian standing in the middle of the street, and

an individual standing near a dark vehicle facing Julian.  (*Id.*).  Mikki at first said she saw

a gun in the individual's hand; she then clarified that she did not actually see him shooting

and could not identify him.  (Mikki: 216).  The shots sounded as if they were coming from

where the individual was standing near the dark vehicle.  (Mikki: 216-17).  The individual

got into the vehicle on the driver's side.  (Mikki: 218).  She did not see the direction in

which the vehicle went.  (Mikki: 220).

When Julian returned to the front porch, he collapsed.  (Mikki: 218-19).  Mikki

lifted up Julian's shirt and saw that he had been shot in the upper right side of his chest.[5]

(Mikki: 219-20).  She called 911 using Julian's cell phone.  (Mikki: 218, 223).  Mikki heard

screeching tires and saw that the dark vehicle was gone; however, she did not see where it

went.  (Mikki: 220).

---

[5]     Julian sustained non-fatal injuries.  (Mikki: 224).  Petitioner initially was charged
with first-degree assault, but the prosecutor deemed the shooting justified and did not
pursue an assault charge before the grand jury.  (*See* October 24, 2014 Tr. at 4).  Julian did
not testify at Petitioner's trial.   At Petitioner's sentencing hearing, the prosecutor
commented that Julian "did not cooperate for the trial" and "does have serious mental
health issues."  (Transcript of March 19, 2015 Hearing ("3/19/15 Tr.") at 4).

Rochester Police Department ("RPD") Officer William Wagner ("Wagner") responded to the 911 call and spoke to Mikki. (Wagner: 258-60). Mikki described the car she had seen as a dark green Saturn Vue; Wagner's partner broadcast that description over the police radio. (Wagner: 260).

Prad testified for the prosecution pursuant to a cooperation agreement.[6] At around 10:00 p.m. on November 21, 2013, Prad was leaving a girlfriend's house on Maple Street in the City of Rochester when he heard his name being called from a Saturn SUV driving down the street. (Prad: 414-15). Prad recognized his friend, Beans (i.e., Petitioner), whom he had known for about a year, sitting in the front passenger's seat of the SUV. (Prad: 415-16). Cotton, also known as Pooh, was driving. (Prad: 418). Prad accepted Petitioner's offer of a ride and got into the backseat. (Prad: 417). Petitioner said he hoped Prad was not in a hurry because he and Cotton wanted to "chill for a little second." Prad replied, "No problem." (Prad: 417).

Cotton drove the car over to Campbell Street and parked it. (*Id.*). Cotton and Prad got out of the car and stood outside. (Prad: 417-18). Petitioner moved from the passenger's seat to the driver's seat and remained in the car with the window open and the stereo playing. (Prad: 418-19).

---

[6]     On October 23, 2014, Prad pleaded guilty to one count of second-degree attempted criminal possession of a weapon (P.L. §§ 110.00/265.03(3)), in full satisfaction of indictment 2013-013980. (SR: 736). The plea was part of a cooperation agreement with the Monroe County District Attorney's Office. (Prad: 433). If Prad testified truthfully at Petitioner's trial, he was promised a determinate sentence of two years' imprisonment plus two years' post-release supervision. (Prad: 465-66). If Prad failed to testify at Petitioner's trial or testified untruthfully, he would be sentenced to a determinate term of seven years' imprisonment plus three years' post-release supervision. (Prad: 433, 450, 465-66).

After about an hour and half, a homeowner on Campbell Street (i.e., Julian) approached the Saturn and said, "you guys are making too much noise, can ya all keep it down?" (Prad: 420). Petitioner got out of the car and said to Julian, "yo, you go in the house, man, you do this shit every night." (*Id.*). Prad told Petitioner, "yo, bro, you're making too much noise, let's just chill out and let him go in his house and it is what it is." (*Id.*). Prad heard Julian say to Petitioner, "yo, I remember your face." (Prad: 421).

Petitioner got back into the driver's seat of the Saturn, Prad and Cotton remained outside the vehicle, and Juian went back to his house. (*Id.*). Prad, Petitioner, and Cotton all continued listening to music. (*Id.*).

Julian reapproached the Saturn about two minutes after he had left. (Prad: 424). Julian said to Petitioner, "I told you I remember your face." (*Id.*). Petitioner then "got out of the car and he shot the guy." (Prad: 424, 440). Prad heard two or three shots. (Prad: 425). Prad recalled that Julian had his hands on his hips, "but he never show[ed] any signs of no weapon or anything." (Prad: 424).

After firing the gun Petitioner got into the back seat on the driver's side of the Saturn, Prad got into the passenger's seat, and Cotton got into the driver's seat. (Prad: 426, 434). Cotton drove away, heading towards Whitney Street. (Prad: 427).

Prad said that when he accepted the ride from Petitioner initially, he did not know that Petitioner and Cotton had guns. (Prad: 426). After the shooting, and as they were driving away from the scene, Prad became aware that Cotton also had a gun. (Prad: 428). Cotton's gun was silver; Petitioner's gun was black. (Prad: 429). Petitioner was the only

person who fired the black gun that night. (Prad: 465). Prad explained that he did not run away immediately after the shooting because he was unfamiliar with the area. (Prad: 427).

As they were driving down Whitney Street, they noticed a marked RPD vehicle driving towards them. (Prad: 428, 430). Cotton and Petitioner handed their guns to Prad, encouraging him to flee because he was the fastest runner. (Prad: 430). Prad "wasn't really thinking" and took the guns. (*Id.*). Prad "came back to [his] senses," dropped the guns into the back seat area, and got out of the car; however, one of the guns fell onto the street. (Prad: 431-32). Prad ran and tried to hide, but he eventually was found by police officers and arrested. (Prad: 432).

At about 10:32 p.m. in the area of Whitney Street, RPD Officers Thomas Minurka ("Minurka") and Paul Romano ("Romano") heard multiple gunshots. (Minurka: 474; Romano: 302-03). They also noticed a green Saturn Vue traveling the wrong way on Campbell Street and making a northbound turn onto Whitney Street. (Minurka: 473-76; Romano: 303-05). There were three individuals in the Saturn. (Minurka: 477).

Minurka and Romano pulled the Saturn over to the side of the road. (Minurka: 477; Romano: 305-06). An individual, later identified as Prad, got out of the vehicle on the rear passenger's side and ran away. (Minurka: 477-78; Romano: 306-07). As Prad was getting out of the car, the officers heard a metallic noise consistent with the sound of a gun being dropped and hitting the pavement. (Minurka: 478; Romano: 306-07). The officers did not chase Prad because there were still two passengers in the Saturn. (Minurka: 480-81; Romano: 307-08).

Petitioner emerged from the driver's side backseat and initially put his hands up, but he then turned and fled. (Minurka: 478-81; Romano: 308). Minurka chased Petitioner and eventually caught him as he was attempting to scale a stockade fence. (Minurka: 481-83). After a brief struggle, Minurka took Petitioner into custody. (Minurka: 483-85).

Meanwhile, Romano approached the Saturn and saw a silver handgun—the .40-caliber Smith & Wesson—lying almost right in the middle of the backseat. (Romano: 308-09; *see also* RPD Officer Thomas Walton ("Walton"): 358). Cotton, who was sitting in the driver's seat, started reaching for the silver handgun. (Romano: 311-12). Romano opened the door, punched Cotton in the face twice, removed him from the vehicle, and handcuffed him. (*Id.*). Romano found a black handgun—the nine millimeter Lorcin—lying on the road near the back door of the Saturn through which Prad had exited. (Romano: 312; *see also* Walton: 357).

Both the silver gun retrieved from the Saturn and the black gun retrieved from the road were loaded with live ammunition. (Walton: 360). Three spent casings were recovered from the sidewalk area where Julian was shot on Campbell Street. (RPD Officer Daryl Hogg: 274-75). All three casings were nine millimeter casings. (RPD Officer Andrew Taylor: 287, 291-92). The parties stipulated that the nine millimeter casings had been fired from the black handgun, and that both weapons were tested and determined to be operable. (T: 469-72).

### 2.    Defense Case

Over the prosecutor's objection to form, the trial court granted defense counsel's request to allow Petitioner to testify in a narrative fashion, as opposed to undergoing a direct examination.  (T: 506-07).  .

Petitioner testified that he was 24 years-old and worked as a barber.  (West: 509).  On the night of November 21, 2013, he had been helping his grandmother with chores at her house on Whitney Street.  (*Id.*).  After he finished, he called a cab.  (*Id.*).  While he was waiting, he saw Cotton's car parked on Campbell Street, so he walked over and talked to Cotton and his companions, one of whom was Prad.  (West: 509-10).  Petitioner asked for a ride, and Cotton agreed.  (West: 510).

After Petitioner got into the backseat of the car, he closed his eyes "just to relax and listen to the music."  (*Id.*).  About a minute later, he heard a rapid and loud succession of gunshots directly outside Cotton's vehicle.  (*Id.*).  Petitioner "immediately . . . curled up in a fetal position" and waited in the back of the vehicle.  (*Id.*).  Then, Cotton and Prad got into the car, which pulled out of the parking lot onto Whitney Street.  (West: 511).

Upon seeing a police car on Whitney Street, Prad asked Cotton to stop so he could get out of the car; Cotton told him to wait to see if the police would pull them over.  (*Id.*).  They kept driving, and the police eventually put their sirens on and approached the car.  (*Id.*).  Prad took a gun from his pocket and asked Cotton to pull over.  (*Id.*).  Cotton then handed a gun to Prad.  (*Id.*).  This was occurring while the car was still in motion.  (*Id.*).

Once the car stopped, Petitioner got out, put his hands up, and said to the officer, "yo, chill, don't shoot me."  (*Id.*).  The officer said, "lay down or I'm going to shoot."  (*Id.*).

Petitioner then turned around and ran away.  (West: 512).  He later was apprehended and brought to the Monroe County Jail.  (*Id.*).

During cross-examination, the prosecutor asked Petitioner whether he was aware that Prad and Cotton had made statements implicating him as the shooter:

> Q.   You became aware that your cousin[, Cotton,] gave a statement saying you were the shooter?
>
> A.   I'm not sure.
>
> Q.   In your discovery package, there was a statement purportedly from your cousin that said you were the shooter, and in your discovery package there was a statement from Mr. Prad that said you were the shooter?
>
> A.   I seen the statement from [Prad].
>
> Q.   And did you see the statement made by your cousin to the police?
>
> A.   No, sir.
>
> Q.   That my blood cousin Brandon West shot that man?
>
> A.   No, sir.
>
> Q.   You were totally unaware of that?
>
> A.   Yes.
>
> Q.   So you were unaware of that, and after receiving the discovery package, you made a phone call to Brody, who I believe is your younger brother, and Brody went to your aunt's house and put Pooh on the phone to talk to you, and you called him a snitch and a rat, didn't you?
>
> A.    No.  I told [Cotton] that he had lied on me, that I wasn't here for his belongings.
>
> Q.   So you were aware that he told the police about you?  He lied on you?  You just said it.
>
> A.   No, sir.  You are misconstruing what I'm saying.
>
> Q.   Well, you said that you weren't aware of the statement that your cousin made against you, but then on the phone, you told him that he lied on you?  So you were aware of the statement or you weren't aware of the statement, because if you weren't, then how did you know that he lied on you?

(West: 530-32).  At that point, defense counsel objected to the form of the question, and the trial court directed the prosecutor to rephrase it.  (T: 532).  The questioning continued:

> Q. You said that you weren't aware of a statement that your cousin made on you?
> A. Yes.
> Q. All right. When you called him, you said you lied on me?
> A. Correct.
> Q. If you didn't know about the statement, you didn't know that he lied on you?
> A. When I came to court, you, sir, stood in court and said that [Cotton] had made a statement saying that this is what took place. I never read no statement sir.
> Q. So at the time that you made the phone call, you were aware of that statement?
> A. Yes.

(West: 532; *see also* West: 543 (admitting that he told Cotton he was a "liar" and called him a "rat" and a "bitch")).

After Cotton hung up on him, Petitioner called Cotton's mother and told her that Cotton was a "bitch." (West: 533). However, Petitioner denied attempting to convince Cotton and his mother not to have Cotton testify against him. (*Id.*). Petitioner claimed that when he asked Cotton, "what are you going to do for that deal[,] [a]re you going to perform for them[,]" he was asking if Cotton was going to take responsibility for the gun he put in the backseat of the Saturn. (West: 533-34, 535). Petitioner admitted making "various other phone calls to [his] family members" in which he "talked about [Cotton] and whether or not he is going to come through for [him]." (West: 534). By that, Petitioner again meant whether Cotton was going to admit responsibility for his gun. (West: 535).

Petitioner admitted sending "kites" or letters to Prad while they were detained at the Monroe County Jail. (*Id.*). Petitioner denied writing to Prad, "don't plea, do the real man thing, I think you should take this all the way." (*Id.*). Petitioner also denied apologizing for his actions on the night of the shooting. (West: 536). He admitted to telling others at

the jail that Prad was snitching on him. (*Id.*). He denied writing the following post-script in the letter to Prad: "I can't say what I have to say like this. Set up a visit and I'll have my bitch come see you or my little brother." (West: 537). When the prosecutor showed Petitioner a copy of the letter, he claimed that he had not written the post-script. (West: 538, 541).

### 3.   Verdict and Sentence

The trial court granted the prosecution's request to charge the jury on consciousness of guilt with regard to the phone conversation between Petitioner and Cotton and Petitioner's jailhouse letter to Prad. (T: 554, 616-17). The prosecutor also requested a jury charge on the automobile presumption. (T: 554-56). The trial court granted the request but only as to the silver handgun found in the backseat of the vehicle. (T: 555-56, 617-18). The jury returned a verdict convicting Petitioner of both counts of second-degree criminal possession of a weapon. (T: 660-61).

At the sentencing hearing, Petitioner admitted his status as a second violent felony offender. (3/19/15 Tr. at 3). The trial court sentenced Petitioner to an aggregate, determinate term of 15 years' imprisonment to be followed by five years' post-release supervision. (*Id.* at 10).

### C.   Motion to Vacate the Judgment

On November 14, 2017, Petitioner filed a *pro se* motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 ("440 motion"). (SR: 1-68). Petitioner contended that defense counsel was ineffective for failing to object to the prosecutor's use of Cotton's out-of-court statement as a violation of the Sixth

Amendment's Confrontation Clause; failing to object to the prosecutor's reference to the statement during closing argument; failing to request a missing witness charge as to Cotton; and failing to object when the jury requested a read-back of Petitioner's entire testimony. (*See* SR: 12-16, 24-35).

The prosecution opposed the motion. (SR: 69-70). The prosecutor argued that since the allegations against defense counsel were matters of record that could be reviewed adequately in Petitioner's pending direct appeal, the motion must be denied pursuant to C.P.L. § 440.10(2)(b). (SR: 70). The trial court summarily denied the 440 motion "for the reasons set forth in the People's response" on February 15, 2018. (SR: 71). Petitioner sought leave to appeal to the Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division"). (SR: 72-512). The prosecution opposed the leave application (SR: 513-14), and Petitioner filed a reply (SR: 515-17). Leave was denied on June 25, 2018. (SR: 518).

### D.    Direct Appeal

Represented by new counsel, Petitioner pursued a direct appeal of his conviction. (SR: 519-59). He asserted, among other claims: (1) the prosecutor violated the Sixth Amendment's Confrontation Clause and committed non-harmless constitutional error by using Cotton's statement identifying Petitioner as the shooter (SR: 534-41); and (2) defense counsel provided ineffective assistance by (i) failing to request a missing witness charge as to Cotton; and (ii) failing to object to the prosecutor's use of Cotton's statement incriminating Petitioner (SR: 549-52). The prosecution filed an opposition brief. (SR: 699-723).

The Appellate Division unanimously affirmed the conviction on June 7, 2019. *People v. West*, 173 A.D.3d 1673 (4th Dep't 2019); (SR: 724-25). Appellate counsel sought leave to appeal (SR: 726-33) as to two claims—the Confrontation Clause claim and a claim regarding a pre-trial ruling under *People v. Sandoval*, 34 N.Y.2d 371, 374 (1974), that is not raised in the petition. The New York Court of Appeals denied leave to appeal on August 9, 2019. *People v. West*, 34 N.Y.3d 939 (2019); (SR: 734).

### E.  Federal Habeas Petition

Petitioner's timely habeas petition raises the following grounds for relief: (1) the prosecutor violated the Sixth Amendment's Confrontation Clause by referring to Cotton's statement incriminating Petitioner as the shooter (Dkt. 1 at 5); and (2) defense counsel provided ineffective assistance by (i) failing to object to the prosecutor's use of Cotton's statement and (ii) failing to request a missing witness charge as to Cotton (*id.* at 7).

Respondent answered the petition (Dkt. 8) and filed a memorandum in opposition (Dkt. 8-1). Petitioner filed a reply. (Dkt. 10).

## III.  DISCUSSION

### A.  Violation of the Confrontation Clause

#### 1.  Background

Petitioner asserts, as he did on direct appeal, that the prosecutor's reference to Cotton's statement implicating him as the shooter violated his rights under the Sixth Amendment's Confrontation Clause. (Dkt. 1 at 5). The Appellate Division rejected the Confrontation Clause claim as unpreserved and, in any event, without merit:

Defendant correctly concedes that he failed to preserve for our review his further contention that the prosecutor's reference to a codefendant's statement violated the Confrontation Clause. In any event, that contention lacks merit. Although the statement was testimonial, it was not offered for the truth of the matters asserted therein, but was instead offered to provide context for defendant's response to that statement.

*West*, 173 A.D.3d at 1673 (citation omitted).

### 2. Procedural Default

Respondent argues that the Confrontation Clause claim is procedurally defaulted from habeas review because the Appellate Division rejected it based on an adequate and independent state ground—defense counsel's failure to preserve the claim by lodging a contemporaneous objection.[7] (Dkt. 8-1 at 13-14). Respondent alternatively argues that the

---

[7]    The Appellate Division did not specifically refer to the contemporaneous objection rule, codified at C.P.L. § 470.05(2). Based on appellate counsel's concession in the opening brief (SR: 536) and the prosecution's response (SR: 712), it is apparent that C.P.L. § 470.05(2) was the basis for the Appellate Division's preservation holding. C.P.L. § 470.05(2) provides in full:

For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. Such protest need not be in the form of an "exception" but is sufficient if the party made his position with respect to the ruling or instruction known to the court, or if in reponse [sic] to a protest by a party, the court expressly decided the question raised on appeal. In addition, a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered.

N.Y. Crim. Proc. Law § 470.05(2).

Appellate Division correctly found there was no violation of Petitioner's right of confrontation and, even if there was, any error was harmless. (*Id.* at 14-20). In his reply (Dkt. 10), Petitioner did not acknowledge Respondent's procedural default argument regarding this claim.

Federal habeas review of a constitutional claim is generally foreclosed when the state court relies on a state rule, procedural or substantive, that is "independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). A state court's alternative ruling, addressing both the state procedural bar and the substantive merits of the claim, does not foreclose the application of the adequate and independent state ground doctrine. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").

The adequacy and independence of the state ground are questions of federal law to be resolved by the habeas court. *Beard v. Kindler*, 558 U.S. 53, 60 (2009) (citing *Lee v. Kemna*, 534 U.S. 362, 375 (2002)). "There is no question that the Appellate Division's explicit invocation of the procedural bar constitutes an 'independent' state ground," *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (citing *Harris*, 489 U.S. at 263), "even though the court spoke to the merits of [Petitioner]'s claim in an alternative holding," *id.* (citing *Harris*, 489 U.S. at 264 n.10). The only question is whether C.P.L. § 470.05(2) was adequate to support the judgment in Petitioner's case.

"[T]he adequacy of a state procedural bar is determined with reference to the 'particular application' of the rule." *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee*, 534 U.S. at 387). "Though a rule in general terms might be considered 'firmly established and regularly followed,' such a rule considered in the specific circumstances of a case might be inadequate to preclude federal habeas review." *Monroe v. Kuhlman*, 433 F.3d 236, 241 (2d Cir. 2006) (quoting *Lee*, 534 U.S. at 376 (noting that there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question")).

The Second Circuit has "held repeatedly that the contemporaneous objection rule[, codified at C.P.L. § 470.05(2),] is a firmly established and regularly followed New York procedural rule." *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011). The Second Circuit further has observed that under New York State law, "a defendant does not preserve a Confrontation Clause claim unless he specifically objects to the introduction of the relevant evidence on *constitutional* grounds." *Chrysler v. Guiney*, 806 F.3d 104, 119 (2d Cir. 2015) (emphasis supplied) (citing *People v. Lopez*, 25 A.D.3d 385, 386 (1st Dep't 2006) (defendant's hearsay objection to introduction of audiotaped police-arranged conversation between defendant and non-testifying codefendant as well as the introduction of non-testifying codefendant's custodial written and stenographic statements as declarations against penal interest did not preserve a Confrontation Clause claim based on those items of evidence); *People v. Bones*, 17 A.D.3d 689, 690 (2d Dep't 2005) (finding Confrontation Clause claim unpreserved where defendant "failed to object with any specificity" that the evidence in question "violated his Sixth Amendment right to confront witnesses against

him")); *see also People v. Fleming*, 70 N.Y.2d 947, 948 (1988) (defendant failed to preserve a Sixth Amendment claim that the trial court violated his right of confrontation by permitting the arresting officer to testify about a conversation with a non-testifying witness; even though defense counsel unsuccessfully requested an anticipatory evidentiary ruling and later objected to officer's testimony by entering objections as "objection" or "leading," he did not advise the trial court that the Confrontation Clause was the basis for the objection).

Defense counsel did not object on any grounds, constitutional or otherwise, to the prosecutor's references to Cotton's statement.  As noted above, there is ample case law demonstrating that the contemporaneous objection rule is firmly established and regularly followed by New York State courts in similar circumstances.  Indeed, "its application here is entirely consistent with and in furtherance of two of the rule's principal objectives: to ensure that 'parties draw the trial court's attention to any potential error while there is still an opportunity to address it,'" *Whitley v. Ercole*, 642 F.3d 278, 288 (2d Cir. 2011) (quoting *Cotto*, 331 F.3d at 245), "and to prevent those who fail to do so from 'sandbagging' the opposing party and the trial court on appeal," *id.* (quoting *Garcia v. Lewis*, 188 F.3d 71, 82 (2d Cir. 1999)).

This is not a case where defense counsel "substantially complied" with the contemporaneous objection rule "given the realities of trial." *Lee*, 534 U.S. at 382.  Instead, defense counsel did not comply with the rule at all.  Under the particular circumstances of Petitioner's case, the Appellate Division's reliance on the contemporaneous objection rule to dispose of the Confrontation Clause claim was not "exceptional," *Lee*, 534 U.S. at 376;

nor does it represent an "exorbitant application," *id.*, of that rule. "To the contrary, its invocation here is well within the parameters of its routine and generally unquestionable application to bar review of unpreserved objections to trial testimony." *Whitley*, 642 F.3d at 288; *see also id.* at 290 (finding no basis to conclude that application of the contemporaneous objection rule was "exorbitant" where, "far from simply failing to meet 'the formal requirements of [C.P.L.] § 470.05(2),' [the petitioner] 'violated the very substance of the rule'" by failing to make the specific legal claim raised on direct appeal before the trial judge) (quoting *Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007)). Accordingly, the Court concludes that the contemporaneous objection rule is adequate to bar consideration of the Confrontation Clause claim on habeas review.

Having determined that the contemporaneous objection rule is both independent and adequate to support the judgment, the Court may not review the procedurally defaulted Confrontation Clause claim unless Petitioner demonstrates: (1) cause for, *and* actual prejudice resulting from, the default; or (2) that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

Petitioner has not attempted to demonstrate cause and prejudice for the default, or that a fundamental miscarriage of justice would occur if this Court does not consider the claim on the merits. Mindful of its obligation to construe Petitioner's *pro se* petition liberally to raise the strongest arguments it suggests, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 472 (2d Cir. 2006), the Court notes that Petitioner asserted in his 440 motion and again on direct appeal that defense counsel was ineffective in failing to object to the prosecutor's reference to Cotton's out-of-court statement as a violation of the

Confrontation Clause.  Therefore, the Court has considered whether defense counsel's alleged error in failing to object constitutes "cause" for the procedural default of the Confrontation Clause claim.

"In order to establish attorney dereliction as cause, a petitioner must meet the standards for showing constitutionally ineffective assistance of counsel." *DiGuglielmo v. Smith*, 366 F.3d 130, 135 (2d Cir. 2004) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)).  Petitioner therefore must satisfy the two-pronged test in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires "both deficient performance by counsel and prejudice as a result of that performance.  *Id.* at 687.

"The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688.  Unless "counsel's representation fell below an objective standard of reasonableness," it does not satisfy *Strickland*'s performance prong. *Id.* at 687-88.  "[E]ven if professionally unreasonable," an error by counsel "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.  Thus, Petitioner "must show . . . a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Since the Appellate Division considered the merits of the Confrontation Clause claim despite it being unpreserved, Petitioner cannot demonstrate prejudice as a result of defense counsel's failure to preserve the claim by means of a timely objection.  *See*, *e.g.*, *Bierenbaum v. Graham*, 607 F.3d 36, 57 (2d Cir. 2010) (holding that where Appellate

Division reviewed the legal insufficiency claim despite it being unpreserved, petitioner could not claim that defense counsel was ineffective in failing to preserve issue for appeal); *Swail v. Hunt*, 742 F. Supp. 2d 352, 364 (W.D.N.Y. 2010) ("Swail cannot demonstrate that he was prejudiced by trial counsel's failure to preserve the insufficiency claim by means of a renewed motion for a trial order of dismissal after the defense case, because the Appellate Division considered the merits of the insufficiency claim, notwithstanding the lack of preservation.").

Petitioner's failure to establish prejudice means that he cannot state a meritorious claim that defense counsel was ineffective. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").  Accordingly, the Court concludes that Petitioner has not demonstrated that defense counsel's failure to object amounts to "cause" for the default.

As the "cause and prejudice" test is phrased in the conjunctive, Petitioner's failure to establish either element is fatal to his ability to excuse the default.  *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) (upholding "adherence to the cause and prejudice test 'in the conjunctive'" (quoting *Engle v. Isaac*, 456 U.S. 107, 134 (1982))); *see also Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985) (finding it unnecessary to reach question of whether petitioner showed prejudice in light of conclusion that petitioner had not established cause for procedural default).

The alternative to showing cause and prejudice is to fulfill the fundamental miscarriage of justice exception.  A fundamental miscarriage of justice occurs when "a

constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.  This exception is "narrow," *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992)).  "'To be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  Petitioner has not come forward with any new evidence demonstrating that he is actually, factually innocent.  Indeed, Petitioner did not argue on direct appeal that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt.  Even if he had, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998)).  Because the record is devoid of any facts supporting a plausible claim of actual innocence, Petitioner cannot fulfill the fundamental miscarriage of justice exception.  Accordingly, the Confrontation Clause claim is subject to an unexcused procedural default and is dismissed on that basis.

### B.   Ineffective Assistance of Counsel

#### 1.   Background

Petitioner asserts that defense counsel was ineffective because he failed to object to alleged Confrontation Clause violations at trial and failed to request a missing witness charge as to his cousin, Cotton.  (Dkt. 1 at 7).  As noted above, Petitioner raised this ineffectiveness claim in the 440 motion (SR: 1-68), filed while his direct appeal was pending.  The trial court denied it on procedural grounds without reaching the merits.  (SR: 71).  Petitioner unsuccessfully sought leave to appeal the denial of the entire 440 motion to the Appellate Division.  (SR: 75-512, 515-17, 518).

In Petitioner's opening brief on direct appeal, appellate counsel raised the same ineffectiveness claim previously presented in the 440 motion. (SR: 549-52). The Appellate Division did not explicitly address the claim. *See West*, 173 A.D.3d at 1673 ("We have reviewed defendant's remaining contentions and conclude that none warrants modification or reversal of the judgment."). Appellate counsel then specifically sought leave to appeal as to only two issues, neither of which was the ineffectiveness claim. (SR: 727-29).

Respondent argues that the ineffectiveness claim is unexhausted because Petitioner omitted it from the leave letter to the New York Court of Appeals. (*See* Dkt. 8-1 at 20-22). Respondent contends that the claim must be deemed exhausted and procedurally defaulted because Petitioner no longer has state remedies available. *See generally Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991); 28 U.S.C. § 2254(c).[8]  Alternatively, Respondent urges the Court to reject the ineffectiveness claim as meritless. (*Id.* at 22-26).

Petitioner acknowledges that he did not present his ineffective assistance of counsel claim to the New York Court of Appeals in his request for leave to appeal but notes that he "did in fact present this very same issue to the trial court . . . in [his C.P.L. §] 440.10 motion." (Dkt. 10 at 9 (citing SR: 157-216)). Petitioner appealed the denial of the 440

---

[8]      More specifically, Respondent asserts that the ineffectiveness claim would be subject to mandatory dismissal under C.P.L. § 440.10(2)(c). However, after Respondent filed his answer, the New York State Legislature amended C.P.L. § 440.10. As of October 25, 2021, "C.P.L. § 440.10(2)(c) now excepts record-based ineffective assistance claims from mandatory dismissal." *Navarro v. McCarthy*, No. 6:20-CV-06094 EAW, 2023 WL 8375858, at *19 & n.10 (W.D.N.Y. Dec. 4, 2023) (citing *People v. Green*, 201 A.D.3d 814, 816 (2d Dep't 2022)). Thus, contrary to Respondent's contention, Petitioner would not face an absence of remedies in New York State court with regard to the ineffectiveness claim, even though it is based on errors appearing on the trial record.

motion to the Appellate Division.  (*Id.*).  As mentioned above, the trial court did not reach the merits of the ineffective assistance claim and instead relied on C.P.L. § 440.10(2)(b) to deny it.

The Court need not devote further time to assessing whether the ineffectiveness claim has been properly exhausted.  AEDPA now gives district courts the authority to deny a petition containing unexhausted claims on the merits.  *See* 28 U.S.C. § 2254(b)(2).  The rationale behind § 2254(b)(2) has been described as "spar[ing] state courts from needlessly wasting their judicial resources on addressing meritless claims solely for the sake of exhaustion."  *Keating v. New York*, 708 F. Supp. 2d 292, 299 n.11 (E.D.N.Y. 2010).

In this Circuit, the various formulations for the proper standard to be used when relying on § 2254(b)(2) share "the common thread of disposing of unexhausted claims that are unquestionably meritless."  *Id.* (collecting cases); *see also Barnes v. Uhler*, No. 6:18-CV-06428 EAW, 2021 WL 5176667, at *14 (W.D.N.Y. Nov. 8, 2021) (relying on the "unquestionably meritless" standard to dismiss unexhausted claims).  The Court already has disposed of the petition's other claim as subject to an unexcused procedural default, and the potentially unexhausted ineffectiveness claim plainly does not warrant habeas relief.  Accordingly, the Court proceeds to address the merits of the ineffectiveness claim.

### 2.  Merits

To establish a violation of the Sixth Amendment's guarantee of effective assistance of counsel, Petitioner must show that his attorney's performance was objectively unreasonable and resulted in prejudice to the defense.  *Strickland*, 466 U.S. at 687.  The Court already has discussed and rejected Petitioner's claim that defense counsel was

ineffective in failing to object to the alleged Confrontation Clause violations.  *See* Section, III.A.2, *supra*.  The Court turns to the sole remaining allegation against defense counsel— that he should have requested a missing witness charge as to Cotton.

Under New York State law, a "missing witness" charge is appropriate where a party can establish that his or her adversary "had the ability to locate and produce the witness and 'there was such a relationship, in legal status or on the facts, as to make it natural to expect the party to have called the witness to testify in his favor.'"  *People v. Keen*, 94 N.Y.2d 533, 539 (2000) (quoting *People v. Gonzalez*, 68 N.Y.2d 424, 429 (1986)).  The proponent of a missing witness charge bears the burden of showing that "there is an uncalled witness believed to be knowledgeable about a material issue pending in the case, that such witness can be expected to testify favorably to the opposing party and that such party has failed to call him to testify."  *Id.*

The burden then shifts to the opposing party who, "[i]n order to defeat the request for a missing witness charge, . . . must demonstrate that the witness is not knowledgeable about the issue, that the issue is not material or relevant, that the testimony from the missing witness would be merely cumulative to other evidence, that the witness is not available[9] or

---

[9]     Respondent contends that Cotton had not yet pleaded guilty in connection with this case at the time of Petitioner's trial, and he therefore could have been expected to "invoke the Fifth Amendment and refuse to testify." (Dkt. 8-1 at 25).  Respondent concludes that Cotton would have been "deemed unavailable." (*Id.*).  However, Cotton's certificate of conviction, which Respondent included as part of the state court records, indicates that Cotton pleaded guilty to attempted second-degree criminal possession of a weapon (P.L. §§ 110.00/265.03(3)) on March 30, 2014. (SR: 735).  He was sentenced on May 15, 2014, to a one-year term of incarceration. (*Id.*).  Petitioner's trial commenced on February 9, 2015.  Thus, Respondent's argument about Cotton's unavailability based on his pre-conviction status is not supported by the record.

that the witness is not under the party's control such that the witness would be *expected* to testify in the party's favor." *Id.* (emphasis in original).

The New York Court of Appeals has "recognized that the 'availability' of a witness is a separate and distinct consideration from that of 'control.'" *Id.* at 540 (quoting *Gonzalez*, 68 N.Y.2d at 428). "Where a witness is under the control of one party, that witness is 'in a pragmatic sense unavailable to the opposing party.'" *Id.* (quoting *Gonzalez*, 68 N.Y.2d at 431).

The Court notes that Cotton was included on the prosecution's witness list. (*See*, *e.g.*, T: 38, 108 (trial court informed prospective jurors that Cotton was one of the civilian witnesses)). During a colloquy that occurred during Romano's cross-examination, defense counsel noted that the prosecutor had said he intended to call Cotton as a witness. (T: 326). The prosecutor agreed, explaining that he had met with Cotton "for three seconds" the previous day but Cotton "didn't have a nice word to say to [him]." (*Id.*). The prosecutor later stated that he told Cotton, "I intend to call you as a witness," to which Cotton "said a couple of words that I'm not going to put on the record right now." (T: 327). The prosecutor also indicated that Cotton had refused to meet with him. (*Id.*). Ultimately, the prosecutor did not call Cotton as a witness.

In this case, defense counsel might have requested a "missing witness" charge. Cotton was present for all of the relevant events on the night of November 21, 2013, and clearly was "knowledgeable," *Keen*, 94 N.Y.2d at 539, about the incidents at issue in Petitioner's case.

However, even if defense counsel had requested a missing witness charge, the prosecutor likely would have been able to defeat the request by demonstrating that Cotton was not under the prosecution's control such that he was likely to have provided favorable testimony.  Cotton is Petitioner's cousin, and he attended the trial.  (*See* T: 325 (defense counsel noted that Cotton was in the courtroom)).  Based on the prosecutor's comments about his unproductive conversations with Cotton (*see* T: 326-27), it appears that Cotton likely would have been an unpredictable witness.  Indeed, Cotton may have been openly hostile to the prosecution if he took the stand.  Thus, even though Cotton may have been physically available to both parties, the prosecutor likely could have rebutted the request for a missing witness charge by showing that Cotton was under the control of the defense and thus was, "in a pragmatic sense[,] unavailable to the prosecution."  *Gonzalez*, 68 N.Y.2d at 431; *see also Keen*, 94 N.Y.2d at 540.

Furthermore, as Respondent argues, any testimony Cotton would have had to offer with respect to the shooting and Petitioner's possession of the weapons recovered by the police would have been cumulative of Prad's testimony on those same subjects.  (*See* Dkt. 8-1 at 25).  In addition, as Respondent notes (*see id.*), Cotton was an accomplice to the crimes allegedly committed by Petitioner, making his testimony "presumptively suspect," *People v. Arnold*, 298 A.D.2d 895, 895 (4th Dep't 2002), or "subject to impeachment detrimental to the [prosecution]'s case," *id.* (rejecting defendant's contention that trial judge erred in denying request for missing witness charge with respect to non-testifying codefendant who had pleaded guilty to reduced charge).  These are additional grounds on

which the prosecutor could have rebutted defense counsel's request for a missing witness charge as to Cotton.

In any event, even assuming that defense counsel could have obtained a missing witness charge with respect to Cotton, Petitioner has not demonstrated that he suffered prejudice as a result.  Given the compelling evidence that Petitioner committed the crimes with which he was charged, there is no "reasonable probability," *Strickland*, 466 U.S. at 694, that the jury would have acquitted him if the trial court issued a missing witness charge as to Cotton.

Petitioner has not shown that defense counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland*, 466 U.S. at 687; or that any of the alleged errors had even "some conceivable effect on the outcome of the proceeding," *id.* at 693.  Under any standard of review, Petitioner cannot satisfy the *Strickland* standard.  Accordingly, the ineffectiveness claim is dismissed as meritless.

## IV.    <u>CONCLUSION</u>

For the reasons above, the request for a writ of habeas corpus is denied, and the

petition (Dkt. 1) is dismissed.  The Court declines to issue a certificate of appealability

under 28 U.S.C. § 2253(c)(1) because Petitioner has failed to make "a substantial showing

of the denial of a constitutional right," *id.* § 2253(c)(2).  The Clerk of Court is directed to

close this case.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:          April 4, 2024
                Rochester, New York